First case on our call this morning is agenda number 18, case number 107328, Provena Covenant Medical Center, et al., Appalant v. Department of Revenue of the State of Illinois, et al., Et Cetera, Appalese. Counsel may proceed. Good morning. May it please the Court, Counsel. My name is Patrick Coffey. I am Counsel to the Appalants in this matter, Provena Covenant Medical Center, as well as Provena Hospitals. As your Honors are aware, this is not a case of first impression. The question of the statutory and constitutional qualification for property tax exemption is a matter that has been before this Court. In fact, it has been before this Court in recent times. In 2004, this Court had the opportunity to revisit the Methodist v. Corzine factors, the standards set forth by the Court, the guidelines articulated by this Court, dealing with the issue of constitutional use, constitutional and charitable use of property for purposes of property tax exemption. In that matter, the Court reaffirmed those factors, reaffirmed those guidelines, and as this Court knows, those are guidelines. Not any one of them are determinative. They are factors and guidelines that are considered in the evaluation of an institution and the determination as to whether or not that institution meets the qualifications for charitable exemption in this State, property tax exemption. The question presented to this Court today is what place, if any, does the amount of free care given by a public charitable institution in a given year have to do with charitable exemption? We submit that the director in this case, the decision underlying this proceeding, was in error. And it was in error based on the director's application of a factor that has never been recognized by this Court as one of the factors to be considered. Indeed, it is a factor that has been, to the extent it has been addressed by this Court, has been rejected as the basis on which to evaluate the nature, the charitable use, the constitutional charitable nature and use of property tax exemption. If this Court is aware, the case that I'm referring to in particular... Counsel, as you've indicated, there have been some other cases that have been determined based on the facts of those particular cases. Do you agree with that? The facts, Justice? Yeah, as you address the factors, you're addressing the facts as they apply to the hospital in question. That's absolutely correct, Justice. And in this particular case, and I think that the crux of your argument is that the amount of the charity that is extended makes no difference as long as it has extended some charity and turned no one away from care. Is that... It would go beyond that, Justice Thomas, to address all of the cores and factors. But certainly the essence of our argument is in an instance where it is unchallenged, uncontested, and indeed admitted that there is a need to address all of these factors. And it is unquestionably admitted by the State that this institution had provided free care to all in need, and without limitation, and without regard to their financial ability to pay, that that institution qualifies for tax exemption. And that would be even in a factual scenario, which I know is different from this one, where there was $1 of free service, for example, that could not be considered in light of all the other factors with respect to imposing a tax. You're saying the quantum doesn't matter. Well, if the quantum doesn't matter for $5,000, it shouldn't matter for $1. Justice Thomas, I don't know... Or, and let me just, I hate to interrupt, or are you saying in this particular case it shouldn't matter when you look at the facts as it relates to this case as to what was given in light of all the other factors, there was enough free service? Or are you asking this Court to say you cannot consider that at all? No, Justice Thomas. This case, like all tax exemption cases of this nature, are determined on the basis of its own facts and circumstances. And our position is based entirely on the record evidence, unchallenged, going to Provena Covenant, its charitable nature, its charitable use, and the evidence, which is unrebutted on the issue that it provided free care to all in need, without limit, and without regard to their financial ability to pay. And without regard to financial ability on the part of any patient who applied for that assistance. And under those circumstances, we believe, considering the other factors as well, which are satisfied also in our position, that there is no question but that charitable exemption is made out on the part of this institution. And we're not arguing some broader concept that it doesn't matter what amount of charity. Here free care was given. Free care was given without limit. Indeed, the record here shows that in 2004, for example, there was, the State has pointed to 2004 and said that this institution changed its charity care guidelines and there was this pent up demand for assistance. Well, there's no basis in the record for that argument. But what there is in the record is the following. The cost being incurred by the hospital in 2003, in 2004, was increasing, both in terms of the Medicaid and Medicare, unfunded costs being incurred in the service of those poor and vulnerable patients, but also the free care. And indeed, in 2004, the hospital, the evidence reflects that it's on track, by the time this was tried, the year had not closed out. But it was on a path to lose $3 million in 2004. Nevertheless, the institution gave away not only approximately $2 million in free care, but $10 million plus in terms of other charitable benefits and contributions to the community. Again, consistent with... Counsel, may I? Were any of these patients later billed that you're now referring to as free patients? Justice, thank you for raising that issue. The state has, and we have, of course, in our brief, gone into at some length the nature and manner of the collection activities and the use of collection activities by this institution. There is not a shred of evidence in the record of this case that suggests Provena Covenant ever sued a charity care patient. There is also no evidence that Provena ever submitted a patient to collections in a situation where that individual had demonstrated, had applied for financial assistance, and had qualified for that assistance. Certainly those claims are made in the briefs in this case. There is no question, and it is troubling, Justice. And we've addressed it in the reply, and we've gone into at length the citations and claims that Provena sued patients, garnished patients, otherwise took advantage of poor and needy people, when in fact the record evidence reflects that that is not the case and that there's no basis for that. And part of the problem here appears to stem from the fact that the state has decided that it doesn't like the record evidence as it was presented to an ALJ, accepted into the record, and then deemed by the director, after the director rejected the ALJ's recommended decision to allow exemption, the director a year later decides to rule out of hand, and on the basis of a conclusion that that evidence going to the charitable nature, the lack of garnishment, the lack of collection activity, was somehow irrelevant. That record evidence cannot be ignored, but it was. And furthermore, no deferences do that type of determination, and the state's effort to curtail consideration of the full record evidence is just not appropriate. I have to, and I'll let it go after this, but I have to understand your position on it. We're going to hear from the opposing side, regardless of the facts as you present them, that there was a negligible or a small percentage of charity, as it related to Provena. You know that's coming. We know it's coming. So I go back to that initial question on the dollar. We may, on that particular point, the court may agree with you. It may agree with opposing counsel. But you started out your talk as if we were not to consider that, or at least I thought you were saying that. And that's why I raised the dollar specter. Is this court going to be forced to determine whether or not there was a small percentage to charity as we look at it, or there was enough given to charity that extended to everybody who asked? Just your position on that, because I think it's important. Well, and I think it's a two-part response, if I might, Justice. In the first instance, there is no requirement that some specific quantum of free care be given in a given year by a charitable institution. That has never been the requirement, and it shouldn't be the requirement. There's no basis. The General Assembly, for example, has determined not to make that a statutory criteria. It has, and of course has been invited by the Constitution. Counsel, if I may, do you agree or disagree it should be part of the totality of the circumstances that can be established? I certainly agree that charity care, the provision of charity care and the methods by which it is done is a relevant factor. The amount of charity given in a given year is also a relevant factor. It could go to, for example, the issue of credibility. It could be used for purposes, not the overall assessment of whether or not you have an institution of public charity. And what are the problems? Haven't cases such as St. Francis and Winnebago Home for the Aged required just such or allowed just such evidence? They have allowed evidence. As I have suggested, it's not out of bounds to consider how much free care was given, but they have also gone beyond. Consistent with this Court's precedence for over 100 years to look at other factors, to look at the totality of the circumstances pertaining to a public institution. And at the end of the day, they have decided, and Sisters of the Third Order is a perfect example, it doesn't matter that there is a disproportionate number of people who pay for their services, as opposed to were provided with free care. That's not the standard, that's not part of the test, that's not part of the constitutional requirement for purposes of exemption. But is it justifiably part of the evidence? Yes, sir, absolutely. We certainly didn't contest and don't contest the notion that that information should be allowed, but we don't see that as being material or even significant in a circumstance where there is an admission that the institution provided charity care to all in need and without limitation. That's the record evidence, and the State has worked over time in an attempt to go back into a record, to selectively take pieces and to mischaracterize evidence in order to create a circumstance along the lines of an allevio, along the lines of a Highland Park, along the lines of a Riverside or some other case where this Court has looked at, not just the amount of charity care or the offer of charity care and the benefits extended, but whether or not obstacles were created, put in the path of individuals, limits were placed on the amount of charity, or in fact there was no charity given. Here there was charity given. Mr. Coffey, in light of the way you framed the issue, I do note that, and I think this will have some bearing obviously on the Court's decision, there's a conflict between the sides as to the standard of review. I think your position is it's de novo and theirs is that it's clearly erroneous and a mixed question of law and fact and administrative proceedings. So where are we at on that, and how does that impact this Court's decision? There is a dispute on that, and I think it's a two-pronged issue. One, in the first instance there's a dispute over what the factual record is. One thing is clear, the facts and the record in this case are undisputed. No evidence was offered by the State, no contest, no objection to any of the evidence that was offered in the course of two weeks by Provena Covenant in support of its charitable nature and exemption. To the extent that the Director has later on determined that certain of that evidence is not in his view relevant, that says nothing about the fact under law, under their rules, under the law of this State. All of that evidence that was properly introduced and admitted is there to be considered, and the Director cannot, cannot ignore that information as he has done in this instance. Furthermore, as to the standard of review, while those facts are uncontested, they went unchallenged, we do have a mixed question. We very much dispute what the proper legal standard is, and that goes to, are the Methodist versus Corazon factors as adopted and recognized again in Eden retirement, are they the test and standard for purposes of charitable exemption? We submit that they are, and that they have within them no requirement as suggested by the State, as the basis offered by the Director to require some specific level of charity care be given. If we were to agree with you that the Director, the Director used the wrong legal standard with respect to the charitable purpose factor by finding that you weren't charitable enough, what is the remedy? Do we remand to the agency for a decision under the right standard, or can this Court just do it itself? Justice Freeman, this Court, under those circumstances, should reverse the Director with directions to reinstate the charitable tax exemption in this institution. The record evidence is there and supports all of the factors under Corazon for charitable exemption and can be recognized by this Court and so ordered and directed. The Director should not have a chance to view what other standards may apply? But the Director had that opportunity. Remember, the ALJ following this trial, the presentation of 17 witnesses, two weeks of evidence, prepared 220 findings of fact, as well as conclusions of law, made the recommendation that this institution be recognized as charitable exempt, sent that to the Director, who spent a year, a year looking at that record, coming to the conclusion that the ALJ was wrong, and wrong because of the standard, wrong because of the facts, so said the Director, applying a standard that's never been adopted or endorsed by this Court, and disregarding the proper standard of review, which we believe this Court has every ability to articulate, clearly erroneous standard now? Clearly erroneous standard you're saying has never been adopted by this Court? No, no, there have been a number of cases addressing the standard by which tax exemption issues shall be decided. In fact, if you look to retirement, for example, the Court looked at in a mixed question circumstance and said that it's a de novo review. Subsequently, in Sinkis, the Court then determined that looking back at the Belleville case, that no, there was a different analysis and mixed questions would be taken up on a clear error basis. Then, of course, there's been the more recent decision in Exelon, and Exelon brings us back full circle to the point that it's de novo in a circumstance where the parties are disputing what the proper standard, what the proper constitutional and statutory requirement is. The amount of free care given in a given tax year has never been part of the standard in Illinois and should not be part of the standard in Illinois. The General Assembly has begun to take some action to look at the question of hospitals and their provision of charity care. This, of course, comes, as we all know, at a very difficult time for health care generally and hospitals in particular. Hospitals in this country are operating on razor-thin margins. They're not being paid for the cost of the care that they provide to Medicare and Medicaid patients, and they're confronted with increasing numbers of uninsured. Now, the General Assembly would be the proper place to determine if there's going to be a change in the law and if there's going to be a requirement that some specific level of charity care be given. That should come as a consequence and a product of that legislative process as invited and set forth in the Constitution. The Department on this issue has never addressed the Sisters of the Third Order and related holdings on the issue of free care and the amount of free care. This Court has. This Court has looked at that issue and very comfortably determined it to lack merit as a claim. There should not be, as long as the other guidelines are satisfied, the amount of free care given in a year. It may be considered, but it is not determinative. And as we suggest, to the extent that there will be a change in the law, we believe that that ought to be left to the legislature to address. The Director has created further error, however, in his decision. And as we've noted and as we set forth in detail in the reply brief, the Director has relied on not only a limited set of facts, but has also made references and distortions of fact in order to support this notion that this hospital was restricting its provision of charity, was not acting in a charitable manner with respect to charity care patients. We have demonstrated that the record facts are otherwise. There was not a policy, there was not a practice, there was not an event where a charity care patient went without care, went without charity care as necessary and without some kind of harassment, dunning or other activity on the part of this hospital. It's one of the absolute fictions against this record to suggest that that happened. And we've gone into that record testimony at length, and I don't mean to take you through it again chapter and verse. We've set it out in the brief, but there is no basis for the assertion that we issue bills to every patient. That's not the case. Charity patients were not issued bills for the very reason that there was an inability to pay. There was not a limitation on the amount of charity given against just a policy. Indeed, the director recognized that in circumstances where someone was given less than 100 percent free care, the hospital continued to stand ready to make other adjustments as necessary based on the individual circumstances of that person. There was not an instance where a single charity patient was subjected to a garnishment, collection, or other action. There's just nothing in the record to suggest that those activities occurred. When you apply all of the factors endorsed by this court in the Methodist case and then recognized again in retirement, this institution qualifies for charitable tax exemption. The evidence is overwhelmingly in support of that finding. Mr. Cawley, earlier in your argument, I think you made reference to some things that have happened in the years subsequent to 2002. Obviously, we can't take those into consideration. Would you agree with that? Justice, I would not. Both parties have, first of all, allowed the introduction of evidence going beyond just the given tax year in question. That evidence was received into evidence. It was considered. It's been argued on the part of the state to suggest that on the basis of census figures alone, that the reason that charity care increased in subsequent years was because of some withholding in 2002, the tax year in question. There's no basis for that. Indeed, the census figures suggesting that there were larger numbers of poor people in that community say nothing at all about the charity care program and operations of this hospital. But to the extent that that information was allowed in, it was allowed in to give more context and a fuller record explanation of what this institution was, how it went about providing its charitable services, and how those circumstances altered year by year, so that in some years you had more charity called for and given, in other years you had less. Excuse me. Counsel, your time is up. But Justice wishes to ask you a question, and that rides over the time. The charter book covenant indicates that it has religious purpose. But the director maintains that it actually demonstrates a primary commercial use. The hospital argument is essentially that it is motivated by a religious purpose. If religious motivation alone were enough to gain an exemption, then almost every kind of activity could potentially fall under it. Would the director's decision on this point be clearly erroneous? Your Honor, with respect, yes. The director, first of all, made no findings, arrived at no determination as to religious use of this property. The director, in the course of that year, spent studying the ALJ's findings and recommendations, somehow missed the fact that she had arrived at and determined that charitable exemption was warranted and never reached the issue of religious use and exemption on those grounds. Nevertheless, the record facts demonstrate that not only did Provena Covenant also have a religious purpose. But would his position be clearly erroneous? Yes, it would. Yes, it would, Your Honor. Yes, it would. In fact, we would distinguish between some organization, some institution that has an incidental religious nature and connection, and an institution such as this. If it is not clearly erroneous, would that in itself be sufficient to affirm the director's decision? I don't believe that it would, Judge, simply because the record evidence showing this Catholic health ministry and all of the things that it does being so obviously connected to the exercise of religious faith, that it could not be rejected on the basis of that evidence and denied. I was going to wait until the rebuttal, but I think I have to ask the question now given the question by Justice Freeman. As to the religious exemption in this case, if we read the briefs correctly, the director ruled that he was adopting the view of the administrative law judge in considering the question of religious exemption. The fact of the matter is, it appears, is the administrative law judge never made such a finding. That's correct, Justice. Which leaves me in the quandary of understanding how the religious exemption issue even is before us at this point. Well, the religious exemption issue is before us because it was applied for. It was acknowledged. It was applied for. That's correct. And it was. Our reading of the brief suggested it was not applied for. Oh, no. It was not applied for at the Board of Review level in the first instance, but at the time of the administrative proceeding before the Department of Revenue, it was not only introduced and requested, but it was acknowledged by the Department of Revenue to be an issue that was present. Didn't you have to go before the county board or the Board of Review, is it, that would make that claim at that level before you even began the administrative process on that issue? That would have been the first opportunity within which to raise that issue. It was not required, and it certainly wasn't, because the Board of Review, remember, in this system only makes a recommendation. They made a recommendation only on the basis of charitable use and exemption. And by the time it gets to the Department of Review, that's when the administrative proceeding begins and we have the opportunity to set forth what our claims are and what our entitlement is under the law. And in that instance, to the extent that our proofs were conforming to a claim for religious exemption as well, it was offered, it was accepted by the department, it was accepted by the ALJ, and it was simply not ruled upon because charitable exemption was granted or at least recommended by the ALJ, Justice. Not ruled upon? How did the director then adopt it? I, to this day, don't have any ability to understand what the director thought he was doing when it came to the adoption of a decision that was not made by the ALJ. Thank you. Good morning, Your Honors, and may it please the Court, I'm Assistant Attorney General Evan Siegel on behalf of the Illinois Department of Revenue and its director, Brian Hamer. I wanted to start out, Your Honors, by addressing some of the questions that just came up. Justice Thomas, you asked whether the amount of critical, the amount of charity care is determinative or if it's the crux of the issue. We submit that it is, because under this Court's Korsen case, the sixth factor, the use of the property itself, is the critical constitutional question. This factor is the only one of the six that nearly verbatim tracks the language of the Illinois Constitution. And this Court held in the Cannon case that that determination about the use of the property is the controlling factor. For that reason, the appellate court correctly called this factor the sine qua non of exemption because it doesn't matter whether an organization itself is charitable, is a charitable organization. What matters on that analysis is whether it's using the property for a charitable purpose. Mr. Siegel, on that point, did the hospital give free service to all who needed it on the year in question? No, I don't believe they did, Your Honor. If they did, okay? If this Court finds that they did, for example. Does the quantum then matter? Yes, it does. So the exemption would go from year to year. If in one year there was $20,000 of free care necessary and they fulfilled that and gave the $20,000 of care, if there was no contest on that, we have to decide whether that's enough to qualify for the exemption. And if the next year it's $400,000, I mean, it's a year-to-year assessment then? Yes, it is, Your Honor. Tax exemption is determined on an annual basis. Just because you have it for one year doesn't mean you have it for every year. And again, going back to my question that these cases hinge on their very facts, I mean, are we being asked to set a floor for the amount of care, free care that has to be given? No, you're not, because as the Chief Justice pointed out, this Court has determined over 100 years ago that the amount of free care is critical, free and discounted care, and it cannot drop below, as this Court held in the 1907 Sisters of the Third Order case, 5%. In that case, the hospital gave 5%, totally free care. Not free and discounted, totally free care. And the Court need not set a percentage certain in this case, because it already answered the question over 100 years ago, what must a hospital do for a charitable exemption? It may fluctuate. I have to stop you, though. It's a 1907 case. I suspect that because the health care was a little bit less than 07 than it is in 2009, right? I mean, we can take judicial notice of that. Of the fact that the delivery of health care has changed in our economy? Absolutely. Yes. We all know that, and we just have to turn on the TV for 30 seconds to be aware of that. But the fact is 5% of, you know, $50,000 is a lot less than 5% of $50 million. So we're still being asked to hold to the 1907 case and set the floor at 5%? No, you need not set the floor or reset the floor. You've already held that to be charitable in that case. 5% was enough. The next year in the Provident Hospital's case, the reasoning of that case was extended, and that hospital provided 20% free care. And then on the same day that the Court decided Provident Hospital decided German Hospital, where a substantial, and that was a standard, a substantial amount of free care was provided. But all the Court need do in this case on this factor, this critical factor, is decide that 0.7% revenues in a year that only 302 people out of 110,000 admissions obtained free and discounted care is not substantial. And Provina has never explained how it meets that trio of cases from 1907 and 1908. I'm sorry, just a follow-up. Why wouldn't we be better off in this day? I'm sure we're going to hear how Medicare and Medicaid impacts the bottom line of the hospitals and a number of other things that they do outside of the hospital that should qualify as free care and everything else. There is a dispute factually, and that's why I asked you that initially, as to whether or not the hospital provided free care to all who needed it. And you say no, they say yes. Why wouldn't this Court be better off than trying to frame some type of quantum of care that's necessary to indicate exactly what they're asking for? As long as a hospital is set up as a not-for-profit charitable institution, why don't we just look at it as if everybody who comes in the door, they're going to allow the care and look at this case factually, like the other cases have been looked at, to see if it was met in this particular case? Well, a couple of responses. First of all, being set up as a not-for-profit entity is not tantamount to being a charitable institution. And their documents don't control their actions. The question is whether they use the property for a primarily charitable purpose, not what they say in their articles of incorporation. But the facts here show that they did not provide charity to everybody who needed it because they defined downward what that need was in 2002. Their own charity care policy, which is found at C-2018 of the record, shows that they gave that you were only eligible if you made between $8,860 and twice that. But within two years, and I believe that the 2004 evidence that they submitted to the record is relevant for comparative purposes, they raised the ceiling to 300% of the charity level. So they defined who needed charity. And the amount of charity they provided between that year, 2002, and 2004, increased by a million dollars from $800,000 in 2002 to 2004. That's not explained, as Pravina implies in its reply brief, that's not explained by a double increase in the cost of medical care. There were more people who obtained charity care in those two periods. Counsel, in the middle. You heard the argument relative to the billing practices. Yes. And the argument was there was no evidence of irregularities in billing practices in this case. Would you like to answer that? Yes. Your Honor, if you obtained free care and you didn't have a balance, and that was only a portion of the 302 people, you aren't sent to a debt collector. But the record shows, and Pravina has conceded, that it, in fact, determined people were eligible for charity care and then sent them to debt collection in that order, that there were 64 people who showed up on both those lists. And the record shows the testimony of their very own financial counselor testified in the hearing. Question, does every patient see the bill, the total charges in a billing statement? Answer, yes. That's at C-327. The hospital CEO also said a bill will be produced for every patient, depending upon what processes have been followed. Their billing protocol, which lays out the timing of how bills were sent to patients, this is found at C-1561, says that within 10 days of service, an itemized bill is sent to the patient. The bills, importantly, do not mention free or discounted care. They talk about financial assistance, which sounds like financing, and they tell the patients to make arrangements. And the bills were sent from the hospital's billing office on remittance drive. Thirty days later, then, only then, were charity applications sent, quote, if the situation warrants, unquote, based on an interview with a financial counselor. And then subsequent to that, accounts were turned over to collection. There's only two patients in the record that I have found mentioned among the 12 that Pravina discussed in its reply brief who got debt collection first and later were given some kind of charity. And it's not clear if the outside debt collection agents were wearing the same hat as the financial aid counselors. One of those individuals was a 41-year-old man who died. And so the hospital gave charity care, reduced his bill, only in death. The appellate court has recognized numerous times that moving somebody from the debt collection column, whether you call it bad debt or not, and placing them in the charitable ledger, that's not an act of, that's not the warmth and generosity, as this court held in Corzine, of the charitable impulse. I also wanted to address the point that counsel made about Pravina not billing the poor and sending charity patients to debt collection. Again, these 64 were people who were charitable because they were at 200 percent of the federal poverty lines. The director's decision found, page 849, that Pravina sent charity patients to collection. Pravina concedes that that's not in dispute. They admitted in interrogatories at C3812, I'm sorry, 3182, that they placed with collection agencies those accounts carrying an unpaid balance, including charity care and government assistance. And it also supplied to us a list of patients whose accounts, quote, merited a percentage reduction, unquote, because of poverty and were, quote, referred to collection, unquote, after not paying the balance of their discounts. Mr. Segal, do you agree that the standard of review is de novo? No, I don't. Why not? Justice Burke, we have a lot of, although Pravina says that the facts are undisputed, there are a lot of facts that come into play here. And the question under the clearly erroneous standard is whether those facts meet the established legal standards. But does that preclude us from looking at the ALJ's factual findings? And just looking at the factual findings of the Department of Revenue? I mean, we're missing something here. Yeah. Only the department's, the director's findings are on review before this Court, around 89 factual findings. The 220 factual determinations of the ALJ, they're not before this Court. This Court doesn't review the findings of an ALJ under the Starkey case. Under Pravina's theory that the ALJ's vision of the case, which was merely a recommendation, under the theory that that governs, then executive agency department heads would be taken out of the picture. ALJs would supplant directors. Well, at this point, it looks like the director could supplant the ALJ. Well, that's his role. The director has the discretion to accept or reject the recommendations of the ALJ. All of the findings or none of the findings. And his decision says that he didn't find all of them relevant or determinative. And they have a different view on certain aspects. Your Honors, for nearly 140 years, property taxes, property tax exemption under the Illinois Constitution has required property owners to show primarily charitable or religious use of their properties. And over 100 years ago, as we've been discussing, this Court answered the central question in this appeal, namely what's expected of a hospital for charitable exemption. Applying those precedents last year, the appellate court correctly denied Pravina exempt status, in part because it didn't, quote, give liberally, as this Court's precedents hold. Instead, it sells at a profit nearly every service. And as the appellate court held, there's nothing particularly kind or benevolent about selling somebody something. And for the intervening century, no decision by this Court has upheld a charitable exemption when nearly 100% of an entity's revenue comes from paying customers. No decision can be read as endorsing exemption when free services account for less than a 1% use of the property. But here, Pravina directed just 0.7% of more than $100 million in revenue to free and discounted care. And that low level amount allowed only 302 patients out of 110,000 admissions to get the free and discounted care. And on the discount ---- Excuse me, Mr. Siegel. Doesn't interpreting Calvary Baptist prevent a meaningful judicial inquiry, the matter of Calvary Baptist? Are you talking about the religious exemption, Your Honor? Yes. No, I don't believe that the holding in that case prevents this Court from reviewing the religious exemption. Meaningful judicial inquiry. No, this Court need not. We have never contended, questioned, whether pastoral care is intrinsic to the mission of Pravina Hospital or whether they provide pastoral care 24 hours a day, seven days a week. The appellate court's discussion of those issues, which we didn't urge, is dicta in its opinion. There's no First Amendment issue here. For that reason and because Pravina never raised that issue in its PLA. And it never raised it below in its briefs. This Court doesn't review the appellate court decision. And that discussion in the appellate court's decision is not germane to the case. There's no decision by this Court that has allowed charitable exemption when debt collectors were used. But as we already discussed, they sent 64 patients they deemed poor to outside debt collectors. And no Illinois court case recognizes the so-called Medicaid gap. The appellate court has three times held that the gap between costs and reimbursement doesn't count towards the charitable bottom line. In the First District Appellate Court's Midwest Physicians Group case and Riverside and Olivio Hospital. And no decision counts as charity what the hospital and its amici call community benefits. This is the established precedent that the director's decision follows. And what Pravina seeks is a radical departure from this Court's settled precedent and from the Illinois Constitution. And our Constitution imposes a demanding burden on taxpayers for one main reason, to separate businesses that don't merit favorable tax treatment from actual charities that do. The Constitution also recognizes that certain types of property owners and certain categories automatically are exempt. But health care in general, and hospitals in particular, never have been part of this select group. So it stands to reason that Pravina now concedes that health care in and of itself, unlike other categories mentioned in the Constitution, is not charity. And they also admit that they're businesslike. Under the Constitution, however, the conduct of a charitable or religious organization must be different qualitatively and quantitatively from a commercial actor. So for these reasons, it's remarkable that Pravina argues in its reply brief in particular that nothing in this Court's precedents or the Illinois Constitution requires it to give away any free anything. Well, then how is this not-for-profit hospital any different than a for-profit hospital? Or, for that matter, from any for-profit business? I'd like to discuss the charitable exemption a little further and get to some of the Court's questions about which factors are germane. They're all germane, but there are three independent ways that this Court can affirm the director. And with respect to just the organizational factor, there are two requirements. First, the organization must be charitable. And second, its use of the property must be charitable. This Court made that determination in the Chicago Patrolman's case. With respect to just the organizational factor, the record's silent about the seven other entities under the Pravina Hospital's umbrella. We don't know what was going on at their hospital in Danville or elsewhere in the state. And because the facts, alternatively, because the facts don't show that this one hospital was charitable, they can't meet the exemption. On the first approach about the seven other hospitals, we stand on our brief unless the Court has any questions. There's a third reason, which we've touched upon, an independent reason for the Court to determine no exemption here is warranted. And that's the sixth coarsen factor, the critical factor. Against the weight of precedent from 1907-08, which is reflected in this Court's later decisions like Eden, where there was only one instance, I think, in that case, where a retirement home resident was given reprieve from the fees. In all those cases, critical factor is how much free and discounted care. And if discounted, the care has to be below cost. The entity can't still make a profit. Against the weight of that precedent, Pravina gives free and discounted care to just 302 patients. That's not a large proportion. And what they're attempting to do, the primary use of the property is the treatment of patients with insurance. By arguing that 0.7 percent is sufficient, Pravina is trying to alter the constitutional standard, and it is for this Court, not the legislature, to determine what constitutes a constitutional charitable use. Mr. Siegel, didn't the Director solely make the decision based on the charitable amount? That's what you're asking. You're saying that we could affirm on that alone and disregard the other five points. You can do that. But he also, absolutely, he also found that they weren't entitled to a religious exemption. And they needed to raise that. Is that before the Court, the religious exemption? I believe it can be under the United Cities gas case, where the Court can take into account the totality of the record and determine whether the record supports the conclusion of the agency. And no remand is necessary. And as we've argued in our brief, the charitable exemption and the religious exemption are closely related because Pravina didn't use its property. Can we go back to whether or not it's part of the record in this case? I'm sorry, can you repeat that? The religious exemption, whether it's part of the record in this case? It is part of the record. I know you said that, but I'm still puzzled at how the director based his finding upon a statement that wasn't there. Well, it was mistaken, absolutely. But I believe that he read the ALJ's opinion as not giving much weight to the religious exemption. Did he read from the ones that he adopted initially, or did he read it from the whole ALJ's record? The whole record was before him, the entire ALJ decision. This Court has held before that in this situation, the agency is not required to make factual determinations about every issue before it. Pravina has conceded at this point that a remand on the religious issue would not be efficient, and we agree. Under our laws, businesses pay taxes, Your Honor. They pay taxes like everyone else to ensure that the tax burden is distributed fairly and equitably among all citizens. Did I miss something, Mr. Shields? Didn't earlier you say that the religious issue was waived by Pravina? Well, I said – no, I did say they – what I said was that they – You said it wasn't in their PLA and it wasn't raised below. Yes, they didn't raise it at the county level. Or in their PLA. No, the first amendment religious issue. Okay, that's where you drew the distinction. Correct. The exemption issue itself was raised for the first time before the department, and it's been throughout the litigation. Thank you for clarifying. Briefly, Your Honors, with the acknowledgement that the director did not apply, the standard that has been set down by this court for over 100 years reflects the fact that error was committed, that this decision must be reviewed, reversed. There is no standard that allows the director to decide charitable exemption on the basis solely of the amount of free care given in a year. It's been acknowledged now that that's exactly what he did. That's certainly what his decision says he did, and that is inconsistent with the laws, inconsistent with the teachings of this court, and should be reversed summarily. With respect to this issue, again, that won't go away. The director did not find anywhere in the decision that we had billed charity patients. Furthermore, the director recognized that the use of collection agencies was occasioned by the fact that in 2002, Provena did not have a system that allowed charity care and other patients to set up a payment plan for those who were in a position to pay something for their care. For that reason, they were referred to, and collection agencies served that function. The director accepted that. There was no notion, no finding at all by the director that that process was being used to somehow harass or annoy or take advantage of charity care patients. So for the director's appellate counsel to now suggest otherwise and take issue with the director's own findings is obviously improper, cannot be allowed. Wasn't there a notice, Mr. Coffey, that went out that indicated you can try to work out a payment plan or call? I thought there was something in the record with respect to a notice that Provena sent out. Well, the record, and this is, again, both stipulated in the facts show, that Provena's personnel made outreach efforts on an ongoing basis, did not, as the government had argued, rely on word of mouth. They provided all types of information to those folks who were in need of charity care and assisted them in connection with applications for care. The suggestion that people went without care here has no basis in the record, nor is there a basis to find that people were sued, harassed, or otherwise mistreated. That simply does not exist in the record. And, indeed, the stipulation of the record... I don't want to make your argument for you, but I think I was right here. There was a notice that went out that indicated if you do not have health insurance, you may be eligible for Medicare, Medicaid, kid care, payment arrangements, or the hospital's financial assistance program, and gave a toll-free number. Absolutely, Justice. I'm sorry if I misunderstood. Provena not only did outreach in the form of people who would interact, financial counselors, but they did send out those kinds of notices in compliance with law that identified and other forms of notice and advertising, if you will, about the availability of care. This is not a circumstance such as those cases that have come along where there was a hospital that billed everybody, didn't let people know about the availability of care, and for that reason did not act in a charitable manner. Here, at every turn, this institution made known to people the availability of financial assistance. The state wants to complain that we didn't say free care at the time, but as Justice Thomas notes, at that point in time, not only did the law not allow a reference to free care, but furthermore, that notice conveyed to people the fact that if they needed assistance, they could come to the hospital. One of the things that was introduced into the evidence, and we clearly have a dispute over what the record evidence is, the director does not have to, of course, accept the recommendation or proposed findings by an ALJ. But what the director has no authority to do is to read out of the record evidence that has been introduced and admitted, accepted by the ALJ as relevant probative evidence,  Once again, the appellate counsel can't alter the record that was introduced below. That's not to say that the director had to accept it. The director could have rejected it. It's stated in the briefs that he did. He did not. What he said was he found it irrelevant. Well, how could it be irrelevant, factors going to the very issues of the use of collection agencies for purposes of assisting patients who had charitable needs? That can't be read out of the record, not in any sense of fairness or under law. Mr. Coffey? Rejecting it, reading it out of the record? I'm sorry, Justice Freeman? Rejecting it, reading it out of the record. Is that the same as reading it out of the record? Well, to say that it's irrelevant is a legal conclusion suggesting that it's somehow improper and not worthy of consideration. You cannot arrive at, and there's no deference to be given to a director who decides that he wants to unring a bell and now reshape the evidentiary record on which a case was tried and presented to the department. That cannot be allowed. Mr. Coffey, do you agree with Mr. Siegel that we're not allowed to look at the ALJ's findings? I certainly agree with the point that the ALJ doesn't dictate a decision to the director. No, I'm asking if it's part of the record for us to review. Oh, it is absolutely part of the record. I believe that to the extent that, for example, Justice Burke, that what we're talking about are factual findings. Those are facts born in the record evidence. And the director can reject them. The question is whether or not that rejection is something that's appropriate or consistent with the standards here. And, of course, as we know and his decision made clear, all he was looking at was one factor. Contrary to the court's teachings, contrary to the law, for 100 years the director decided, and this is in obviously direct contravention of this court's instruction in Sisters of the Third Order, it doesn't matter how much free care you give away, as long as you make it available to all without limitation. And the director admitted that's what this hospital did, and that should end the inquiry. Do we judge the director by a clearly erroneous standard as to which points he did adopt and which points he did not adopt? Again, I think in that instance it is not a clearly erroneous, because now we're back to the disputed standard question. It's a factual dispute. It's not. Well, it's both. It's a factual dispute. What was the record testimony accepted into evidence? But furthermore, is the director's findings then, is the director's conclusion consistent with that evidentiary record? Can we submit that it is not, Chief Justice? With respect, Judge, we seek the reversal of the director's order, and thank you. Thank you, both counsel, for your arguments. Case number 107328 will be taken under review.